UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Rebecca Oelmann and Lance Oelmann,

Plaintiffs,

v.

Mayo Clinic Rochester,

Defendant.

Civ. File No. 00-2101 (PAM/SRN)

**MEMORANDUM AND ORDER**

---

This matter is before the Court on Defendant's Motion to Dismiss pursuant to Minn. Stat. § 145.682. For the reasons that follow, the Court grants the Motion and dismisses Plaintiffs' claims without prejudice.

## BACKGROUND

In August 1997, Plaintiff Rebecca Oelmann underwent breast reduction surgery at Mercy Hospital in Des Moines, Iowa. Several months after the surgery, she developed an infection in her right breast. In December 1997, she was referred to Dr. Cass Franklin of General Vascular and Transplant Surgery in Des Moines for treatment of the post-surgical infection. In February 1998, Dr. Franklin hospitalized Ms. Oelmann and incised and drained her breast. Dr. Franklin also obtained tissue cultures which revealed that the infection present was mycobacterium fortuitum.

Following a course of antibiotic treatments, debridements, and packing of the wound, it appeared that Ms. Oelmann was healing. In July 1998, however, she developed a hard

FILED OCT 24 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD OCT 24 2001
DEPUTY CLERK

lump under her right breast. After briefly consulting with another doctor, she eventually sought treatment at Mayo. Ms. Oelmann allowed her records to be forwarded to the Mayo Breast Clinic from Mercy Hospital. These records were received by Mayo on September 15, 1998. On September 16, 1998, Ms. Oelmann was evaluated by a resident, Dr. Joseph Capella. Dr. Stephan Finical, the staff surgeon supervising the resident, was also present during the evaluation. Apparently, these physicians determined a course of treatment without looking at Ms. Oelmann's prior medical records. On September 17, 1998, Dr. Cappella performed an incision and drained Ms. Oelmann's right breast to remove any infected tissue. As a result of the procedure and subsequent pain, Ms. Oelmann remained hospitalized until September 23.

Again, Ms. Oelmann's wound appeared to be healing. On December 3, however, she returned to Mayo because she was concerned with a painful and firm area in her right breast. Dr. Capella examined her and determined that the painful area was merely scar tissue. Unsatisfied with that determination, Ms. Oelmann sought a follow-up opinion with a family physician. Ultimately, Ms. Oelmann sought treatment from Dr. Gwen Huitt, a nationally renowned expert in mycobacterium fortuitum. In July 1999, Ms. Oelmann underwent a partial mastectomy, on the recommendation of Dr. Huitt, to remove tissue infected with mycobacterium fortuitum.

In December 1999, Ms. Oelmann and her husband commenced a medical malpractice action in Iowa state court against Dr. Franklin and Mercy Hospital. The Oelmanns then amended their complaint to add Mayo as a defendant. The Iowa court, however, dismissed

Mayo for lack of personal jurisdiction. In September 2000, the Oelmanns commenced this lawsuit, claiming that Mayo should have known that Ms. Oelmann's breast was infected with mycobacterium fortuitum and that Mayo failed to treat her infection properly. Mayo has now filed this Motion seeking to dismiss the Oelmanns' claim for failing to meet the statutory expert disclosure requirements of Minn. Stat. § 145.682.

**DISCUSSION**

It is undisputed that the Oelmanns must use expert testimony in this case to establish a prima facie case of malpractice. Bellcourt v. United States, 784 F. Supp. 623, 638 (D. Minn. 1992) (citing Sorenson v. St. Paul Ramsey Med. Ctr., 457 N.W.2d 188, 191 (Minn. 1990) for the proposition that "[g]enerally, expert testimony is needed to prove a prima facie case of medical malpractice" and that "[e]xpert testimony is particularly necessary in cases involving a failure to diagnose"); see also Chizmadia v. Smiley's Point Clinic, 768 F. Supp. 266, 271 (D. Minn. 1991) (citing Harvey v. Fridley Med. Ctr., P.A., 315 N.W.2d 225, 227 (Minn. 1982) for the proposition that when the issue is not within the common knowledge of laymen, expert testimony is required). Accordingly, under Minn. Stat. § 145.682, the Oelmanns must meet two statutory requirements. First, the Oelmanns must have served with the complaint an affidavit stating that the attorney has reviewed the case with an expert and that in the expert's opinion Mayo injured Ms. Oelmann due to a deviation from the applicable standard of care. Minn. Stat. § 145.682, subds. 2, 3. Second, within 180 days of

the commencement of the suit, the Oelmanns must serve an affidavit identifying the experts who will testify at trial, the substance of their testimony, and a summary of the grounds for their opinions. Minn. Stat. § 145.682, subds. 2, 4.

Mayo argues that the Oelmanns' complaint should be dismissed because the Oelmanns failed to satisfy this second requirement. Specifically, Mayo argues that (1) the Oelmanns' expert's affidavit does not satisfy the disclosure requirements of the statute; and (2) the Oelmanns' expert is not qualified to testify concerning the standard of care for a plastic surgeon.

### A. Disclosure Requirements of Section 145.682

Section 145.682, subd. 4, requires that all persons who commence a medical malpractice action file affidavits verifying that their allegations of malpractice are well founded. The Minnesota Supreme Court has held that this expert disclosure must include "specific details concerning . . . the applicable standard of care, the acts or omissions that plaintiffs allege violated the standard of care and an outline of the chain of causation that allegedly resulted in damage to them." Sorenson, 457 N.W.2d at 193; see also Anderson v. Regachary, 608 N.W.2d 843, 847 (Minn. 2000) (same); Lindberg v. Health Partners, Inc., 599 N.W.2d 572, 577 (Minn. 1999) (noting that the statute requires "far more information than simply identification of the experts intended to be called at trial or a 'general disclosure'").

There is no question in this case that the Oelmanns submitted an affidavit which adequately identifies their expert, Dr. Huitt. Instead, the debate centers on whether Dr. Huitt's affidavit adequately identifies the applicable standard of care and sufficiently outlines the chain of causation.

**1. Standard of Care**

Mayo contends that Dr. Huitt makes only one reference to the standard of care in her entire disclosure: "[Dr. Capella] deviated from accepted standards of care in that operative cultures did not include material submitted for fungal and mycobacterial cultures." This lone reference, Mayo argues, is conclusory and does not identify the applicable "standard of care" in this case.

The Oelmanns respond by citing a lengthy bit of Dr. Huitt's affidavit which they say makes it clear that the standard of care applicable in this case required Dr. Capella to request and review Ms. Oelmann's prior medical records. The pertinent portion of the affidavit states that

> [u]pon review of provided medical records of Dr. Capella there is no indication that the requested copies of prior medical records regarding this patient's therapy which had a direct impact on the subsequent surgical procedure that he performed on a [sic] plaintiff. If he would have requested copies of Dr. Franklin's records, there is a high likelihood that the culture results from Mycobacterium fortuitum from the plaintiff's right breast would have altered the subsequent surgical procedure that he performed and the antibiotic regimen that he proscribed.

Mayo contends, however, in its reply memorandum, that when contrasted with the statements held to be adequate in Demgen v. Fairview Hosp., 621 N.W.2d 259 (Minn. Ct.

App. 2001), the deficiencies of Dr. Huitt's affidavit become apparent. In Demgen, defendants failed to react to abnormalities noted on a fetal heart rate monitor, resulting in the stillbirth of plaintiff's child. Id. at 260-61. Plaintiff relied on the affidavit of a doctor who offered the following description of the standard of care:

> When the non-reassuring fetal heart rate tracing is indicated at inception of admission, further evaluation should have been performed. The . . . standard of care requires that a doctor be immediately called in to do further testing . . . . The . . . standard of care under the circumstances of this case would dictate that a fetal acoustical stimulation test . . . should have been performed.

Id. at 263.

While not articulated with the utmost clarity, the Court finds that Dr. Huitt's affidavit establishes a standard of care and shows how the treating physician deviated from that standard. Despite the fact that the doctor in Demgen was slightly more articulate and through, and despite the fact that the doctor in Demgen explicitly used the phrase "standard of care," Dr. Huitt has provided substantively the same information. In reaching this conclusion, the Court is mindful of Justice Gilbert's concern that reading section 145.682 too narrowly runs the risk of "reverting back to code pleading . . . requiring plaintiffs to initially allege all detailed facts sufficient to prove" their claims or requiring plaintiffs "to literally try their cases in pre-trial affidavits." Anderson, 608 N.W.2d at 852-53 (Gilbert, J., concurring in part and dissenting in part).

**2. Chain of Causation**

Although Dr. Huitt's affidavit identifies a standard of care, it must also sufficiently

establish the chain of causation connecting Mayo's alleged negligence to the Oelmanns' damages. As Mayo points out, the Minnesota Supreme Court has drawn a distinction between an "outline of the chain of causation" and a "conclusory statement as to causation." Stroud v. Hennepin County Med. Ctr., 556 N.W.2d 552, 556 (Minn. 1996); see also Lindberg, 599 N.W.2d at 578 (holding that an expert affidavit contained "nothing more than broad and conclusory statements as to causation").

The Oelmanns argue that Dr. Huitt's affidavit must merely confirm that a casual connection exists between the breach of the standard of care and the Oelamanns' damages. Implicit in Dr. Huitt's affidavit, the Oelmanns contend, is the claim that if Dr. Capella had reviewed Ms. Oelmann's prior medical records, he would have seen the diagnosis of mycobacterium fortuitum. Dr. Capella then would have been able to appropriately treat Oelmann's infections.

Even if this Court agrees that these claims are implicit in Dr. Huitt's affidavit, and even if implicit claims can satisfy the disclosure requirements of section 145.682, these particular claims, in and of themselves, are insufficient to meet the requirements of the statute. These claims fail to provide any indication as to how much pain and suffering Ms. Oelmann would have been spared if she had received the appropriate treatment from Mayo in September 1998. In short, these implicit claims do not alter the broad and conclusory nature of Dr. Huitt's affidavit statements about causation.

The Oelmanns contend that because Dr. Huitt is not simply an expert in this case, but is also a treating physician, the subsequent treatment by Dr. Huitt in some sense amends

Huitt's affidavit. This amendment through conduct, the Oelmanns imply, fills out Dr. Huitt's description of the chain of causation.

As Mayo points out, however, Minnesota courts have held that plaintiffs cannot meet the requirements of section 145.682 by supplementing their expert's affidavit with external information. See, e.g., Anderson, 608 N.W.2d 843, 848 (Minn. 2000) (stating that non-affidavit materials will not excuse or justify an affidavit of an expert falling short of the substantive disclosure requirement); Stroud v. Hennepin County Med. Ctr., 556 N.W.2d 552, 554 (Minn. 1996) (rejecting plaintiff's argument that the expert affidavit should be read in conjunction with decedent's's death certificate). Additionally, even if such amendment through conduct were possible, Dr. Huitt's treatment at most demonstrates what the appropriate treatment should have been. By itself, however, Dr. Huitt's treatment of Ms. Oelmann provides no indication as to how much damage, if any, Ms. Oelmann suffered as a result of not receiving the appropriate treatment in September 1998. Accordingly, Dr. Huitt's affidavit is deficient because it fails to sufficiently establish the chain of causation connecting the Mayo doctors' breach of the applicable standard of care with the damages that the Oelmanns are claiming.

**B. Dr. Huitt's Qualifications**

Because Dr. Huitt is not a plastic surgeon, Mayo argues that she is not qualified to testify as to what standard of care is applicable to Drs. Capella and Finical, who are both plastic surgeons. Mayo correctly states that doctors are generally entitled to be judged according to the standards and principles of their particular schools of practice. See

McLaughlin v. Dahlquist, No. C6-95-9205, 1997 WL 259984, at *2 (Minn. Ct. App. May 20, 1997) (citing Nelson v. Dahl, 219 N.W. 941, 942 (1928)).

The Oelmanns persuasively respond, however, by noting that the opinions offered by Dr. Huitt involve the treatment of a chronic wound infection caused by mycobacterium fortuitum. Dr. Huitt is an undisputed expert in such infections. Whatever the specialty practice of Drs. Capella and Finical, they understood the obligation to treat Ms. Oelmann's chronic wound infection.

The Court agrees. This is not a case about plastic surgery. Rather, it is a case about an infection. Plastic surgeons were involved because of the cosmetic interest in avoiding scarring and other non-desirable side-effects of treatment. The claim at issue in this case, however, does not directly involve any cosmetic problems. Rather, the Oelmanns claim that the Mayo doctors failed to diagnose and properly treat an infection. Because Dr. Huitt specializes in the treatment of infections, Dr. Huitt is perfectly qualified to discuss the infection at issue in this case.

**C. Appropriate Sanction**

Mayo argues that a dismissal is mandated in this case. In relevant part, section 145.682, subd. 6, states that "[f]ailure to comply . . . with subdivision 4 results, upon motion, in mandatory dismissal with prejudice of each cause of action as to which expert testimony is necessary to establish a prima facie case." Minn. Stat. § 145.682, subd. 6. Mayo claims that this language compels dismissal when the substantive requirements of subdivision 4 are not fully met. See Lindberg, 599 N.W.2d at 578 (stating that "[d]ismissal is mandated under

Minn. Stat. § 145.682, subd. 6 when the disclosure requirements are not met . . . [the statute] cuts with a sharp but clean edge").

The Oelmanns request that this Court carefully evaluate the degree of prejudice caused by the inadequate expert disclosure in order to determine if some less drastic alternative to a procedural dismissal is warranted. See Sorenson, 457 N.W.2d at 193 (noting that in "borderline cases where counsel for a plaintiff identifies the experts who will testify and give some meaningful disclosure of what the testimony will be, there may be less drastic alternatives to a procedural dismissal"). Mayo argues that Sorenson was effectively eviscerated by Minnesota Supreme Court in Lindberg. Mayo's argument, however, overlooks the fact that in Anderson the court resurrected the borderline case exception of Sorenson. Anderson, 608 N.W.2d at 848-49.

Because the Court believes that this is a borderline case, and in light of Minnesota's general preference for deciding claims on the merits, see, e.g., Sorenson, 457 N.W.2d at 192 (stating that "the primary objective of the law is to dispose of cases on the merits"); Lunzer v. Qualey, No. C7-97-862, 1997 WL 729226, at *1 (Minn. Ct. App. Nov. 25, 1997) (same); Henke v. Dunham, 450 N.W.2d 595, 598 (Minn. Ct. App. 1990) (same), the Court will grant Mayo's Motion but dismiss the Complaint without prejudice.

**CONCLUSION**

Based on all the files, records, and proceedings herein, the Court finds that the affidavit of the Oelmanns' expert witness, Dr. Huitt, does not meet the statutory disclosure requirements of Minn. Stat. § 145.682, subd. 4. Specifically, it fails to establish a chain of causation connecting the Mayo doctors' breach of a standard of care with the damages claimed by the Oelmanns. However, because this is a close case, a dismissal without prejudice is warranted.

Accordingly, **IT IS HEREBY ORDERED** that:

2. Defendant's Motion to Dismiss pursuant to Minn. Stat. § 145.682, subd. 4 (Clerk Doc. No. 13 ) is **GRANTED**; and

2. Plaintiffs' Complaint is **DISMISSED WITHOUT PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: October 22, 2001

Paul A. Magnuson
United States District Court Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995